1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES MONROE,<br><br>                            Petitioner,<br><br>         vs.<br><br>A. HEDGPETH, Warden,<br><br>                            Respondent. | Civil No.        08cv1812 L (JMA)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, AND**<br><br>**(2) DENYING REQUEST FOR EVIDENTIARY HEARING** |

## I.    INTRODUCTION

James Monroe, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCD189308.  The Court has considered the Petition and Exhibits, Respondent's Answer, Petitioner's Traverse and all the supporting documents submitted by the parties.  Based upon the documents, and for the reasons set forth below, the Court recommends that the Petition and Monroe's request for an evidentiary hearing be **DENIED**.

## II.    FACTUAL BACKGROUND

The following statement of facts is taken from the California Court of Appeal opinion, *People v. Monroe*, No. D048740, slip op. (Cal. Ct. App. Feb. 29, 2008).  This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.

1    § 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical

2    fact, including inferences properly drawn from such facts, are entitled to statutory presumption

3    of correctness).  The facts as found by the state appellate court are as follows:

4    A. People's Case

5    1. L.Y.

6    In January 2005 L.Y. was working as a prostitute on El Cajon Boulevard in San Diego.  L.Y. saw Monroe drive by her a couple of times in a burgundy Ford Expedition.  He stopped his car in the middle lane and asked L.Y. if she wanted a ride.  He said no one would see her if she hurried and got into the car.  After Monroe denied being a cop, she got into his car.  L.Y. told him her name was Sarah, and he told her his name was Yohan.  L.Y. agreed to orally copulate and have sex with Monroe for $100.

10   Monroe drove to a residential area about 10 blocks away and parked his car on the street.  L.Y. turned to her right to see if her passenger door was locked and felt something poking her in the side.  Monroe had a gun pointed at her left rib cage and his penis was pulled out of his pants. Monroe told her, "Give me some head."

13   L.Y. screamed and asked Monroe, "[W]hat are you doing?"  Monroe kept jabbing her with the gun and demanding that she "give [him] some head."  L.Y. decided to cooperate with Monroe so he would not shoot her.  She reached for a condom and Monroe told her not to use one because he did not like condoms.  L.Y. performed oral sex on Monroe while he pointed the gun at her back, pushing down on her head with his other hand.

16   While L.Y. was orally copulating Monroe, he demanded that she "[g]ive [him] some pussy."  L.Y. lied and told him she could not have sex because she had recently had an abortion.  Once they were finished, Monroe put the gun in the pocket of the driver's side door.  L.Y. began crying.  Monroe apologized and dropped her off in the same vicinity where he had picked her up.  As Monroe was dropping her off, he moved the gun to the back seat of his car.  He also told L.Y. that next time he would give her money.

20   L.Y., who was hysterical at this point, looked for a police officer, and then called her boyfriend on a pay phone and asked him to pick her up.  Meanwhile, a man saw L.Y. and asked her if she wanted to call the police.  She told him "no" because she had a warrant out for her arrest.  L.Y. asked, and the man gave her a ride home.

23   The next day, L.Y. called S.T. and some other prostitutes to warn them not to get into Monroe's car.  A few weeks later, when she was working as a prostitute, she saw Monroe's car.  A few weeks after that, she heard that Monroe had raped S.T.  Thereafter, L.Y. contacted the police and told them what happened to her.

26   L.Y. admitted she had prior misdemeanor convictions for prostitution and loitering for prostitution.  She also believed there was a warrant out for her arrest because she failed to obtain a court-ordered AIDS test.

2. S.T. [Footnote 2]

[Footnote 2:  S.T. was not present at trial and her preliminary hearing testimony was read to the jury. The propriety of the court declaring her an unavailable witness to allow that testimony to be read to the jury is discussed in more detail post.]

On February 14, 2005, S.T. parked her car on Ohio Street and walked to El Cajon Boulevard to engage in prostitution.  Monroe pulled up next to her in a burgundy Ford Expedition and told her to get in. S.T. ignored Monroe and kept walking down El Cajon Boulevard.  Monroe pulled up next to her again, got out of the car and said, "My money's not good enough?"  S.T. replied, "No. Leave me alone."  S.T., who is also Black, explained that, for a variety of reasons, most prostitutes "don't date Black guys."

S.T. turned around and began walking back to her car.  As she was walking down Ohio Street, she saw Monroe walking towards her, near where she had parked her car.  S.T. turned around again and began walking back to El Cajon Boulevard.  Monroe approached her from behind, pointed a gun in her back and said, "Don't move. Don't make any sounds or I'll shoot you."  Monroe forced S.T. into the back seat of his car and drove to the parking lot of an office building on Camino Del Rio South.  All the while, Monroe pointed his gun at her.

Monroe told S.T. to pull down her pants.  She started to pull them down but Monroe became impatient and yanked them down.  Monroe climbed into the back seat with her, removed his shirt, and told her to orally copulate him.

S.T. told Monroe that she needed to use the bathroom.  However, he would not let her out of the car, so she urinated a little on the back seat.  Monroe then let S.T. out of the car to urinate, while holding the hood of her jacket and pointing the gun at her.  She then got back in the car, leaving the passenger door unlocked.

Monroe forced her to perform oral sex on him without a condom until he became erect.  Monroe then climbed on top of her and told her, "I want some pussy."  He then had intercourse with S.T. without a condom.

Monroe was interrupted when he saw Jeffrey Barber leave the office building and walk to his car.  S.T. took the opportunity to flee from Monroe's car through the unlocked passenger door.  Monroe grabbed her jacket, ripping it, and S.T. began to scream.  She was able to break loose and ran towards Barber.  She climbed over and then fell down a four-foot wall separating the level of the parking lot where Monroe was parked and the lower level where Barber was parked.  She then ran to Barber's car.

When Barber reached his car, he heard someone screaming, "Help me, please.  Don't leave. Stop.  He's raping me. Gun.  Help, help, help, help.  Stop.  Help."  Barber looked to the right and saw S.T. fall to the asphalt from the wall.  S.T. ran to Barber's car and got in the front passenger side. S.T. was completely nude except for a white puffy jacket.  S.T. was hysterical.  Barber got out of his car and saw a man next to a sports utility vehicle (SUV), with its driver's side front and rear doors open, reaching into the back seat.  Barber grabbed S.T. by the jacket and they jumped over a retaining wall and ran west.  Barber then saw the man with the SUV start his car and drive away. Barber and S.T. returned to Barber's car and he called 911.

San Diego Police Officer David Spitzer responded to the scene. S .T. told him that she was working as a prostitute when Monroe forced her into his car at gunpoint, forced her to orally copulate him, and then raped her for about five minutes until she escaped. Officer Spitzer took S.T. to the hospital for a sexual assault examination. Officer Gary Hill located what appeared to be a puddle of urine in the parking lot.

S.T. told police that she had made two "house calls" earlier that day. She also remembered L.Y. telling her to stay away from a man named Yohan who was possibly in the military and drove a Ford Expedition. She also admitted she was on probation for prostitution.

Both L.Y. and S.T. identified Monroe in photo lineups. Monroe's house was searched and it was determined he owned a burgundy 2000 Ford Expedition. He was arrested shortly thereafter.

B. Defense Case

Detective Thomas Joy described an incident on January 1, 2005, when he was working undercover to catch prostitutes. That evening, S.T. solicited sex to Detective Joy and was arrested.

Criminalist Sean Soriano examined the back seat of Monroe's car and found semen. Soriano did not test the back seat to determine if there was urine there.

Skin scrapings underneath S.T.'s fingernails were checked for a DNA analysis because S.T. had reported, "I had my nails in his back when he was on top of me." In the scrapings, criminalist Ian Fitch found semen cells as well as skin cells belonging to S.T. and another woman. There were not enough sperm cells to run a DNA analysis and identify the donor.

(Resp't Lodgment No. 18 at 3-8.)

## III.   **PROCEDURAL BACKGROUND**

On March 2, 2006, the District Attorney for the County of San Diego filed an Amended Information charging James Monroe with eight counts related to the sexual assaults of two victims. The information alleged two counts of forcible oral copulation (Cal. Penal Code § 288a(c)(2)); one count of assault with intent to commit oral copulation (Cal. Penal Code § 220(a)); two counts of possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)); one count of kidnaping for rape (Cal. Penal Code § 209(b)(1)); one count of forcible rape (Cal. Penal Code § 261(a)(2)); and one count of assault with intent to commit rape. (Cal. Penal Code § 220(a)). (*See* Resp't Lodgment No. 1, Vol. 1 at 76-82.)

On March 10, 2006, after a jury trial, Monroe was convicted of all eight counts. The jury also found that Monroe had personally used a firearm as to four of the counts (Cal. Penal Code

§ 12022.3(a)); committed an offense against more than one victim (Cal. Penal Code § 667.61 (a), (c), (e)); and kidnaped a victim for the purpose of committing a sexual offense (Cal. Penal Code § 667.8(a); 667.61 (a), (c), (d)). (*See* Resp't Lodgment No. 1, Clerk's Tr., Vol. 2 at 177-86.)  Monroe also admitted having five prior convictions, including a prison prior, a serous felony prior and one strike prior under California's Three Strikes law (Cal. Penal Code §§ 667.5(a)(1), (b)-(i); 668; 1170.12; and 1192.7). On May, 31 2007, the court sentenced Monroe to 109 years to life in prison.  (Resp't Lodgment No. 2, Clerk's Tr., Vol. 2 at 0265-67.)

Monroe  appealed to the California Court of Appeal, Fourth Appellate District, Division One.  (*See* Resp't Lodgment No. 15.)  On February 29, 2008, the appellate court affirmed Monroe's  conviction in an unpublished decision.  (Resp't Lodgment No. 18.)  Monroe filed a petition for review in the California Supreme Court.  (Resp't Lodgment No. 19.) The court denied the petition without comment on May 14, 2008.  (Resp't Lodgment No. 20.)

On October 3, 2008, Monroe filed the instant Petition in this Court.  [Doc. No. 1]. Respondent filed an Answer on January 12, 2009 [Doc. No. 7], and Petitioner filed his Traverse on January 26, 2009 [Doc. No. 9].

IV.   **DISCUSSION**

A.   **Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States*.

28 U.S.C § 2254(a) (emphasis added).

The current petition is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d) reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits* in State court proceedings unless the adjudication of the claim –

1

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2

3

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4

5   28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

6   To obtain federal habeas relief, Monroe must satisfy either § 2254(d)(1) or § 2254(d)(2).

7   *See Williams v. Taylor*, 529 U.S. 362, 403 (2000). The Supreme Court interprets § 2254(d)(1)

8   as follows:

9

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

10

11

12

13   *Williams*, 529 U.S. at 412-13; *see Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

14   Where there is no reasoned decision from the state's highest court, the Court "looks

15   through" to the underlying appellate court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06

16   (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal

17   habeas courts must conduct an independent review of the record to determine whether the state

18   court's decision is contrary to, or an unreasonable application of, clearly established Supreme

19   Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds

20   by *Lockyer*, 538 U.S. at 75-76); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

21   However, a state court need not cite Supreme Court precedent when resolving a habeas corpus

22   claim. *Early v. Packer*, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result

23   of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision

24   will not be "contrary to" clearly established federal law. *Id.*

25   **B.   Analysis**

26   Monroe raises three grounds for relief: (1) his Sixth Amendment rights were violated

27   when the trial court permitted the preliminary hearing testimony of one of the victims, who did

28   not testify at trial, to be admitted as evidence; (2) his Sixth Amendment rights were violated

08cv1812

when the trial court permitted the transcript of the non-testifying victim's 911 emergency call to be admitted as evidence; and (3) his Due Process rights were violated when the jury was instructed, pursuant to California Jury Instructions - Criminal ("CALJIC") Numbers 220 and 222. (*See generally*, Pet. at 6-9.)  Monroe also requested an evidentiary hearing.  (*See* Traverse at 11.)  Respondent argues that the state appellate court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established law and that Monroe is not entitled to an evidentiary hearing.  (*See generally*, Answer.)

### *1.    Preliminary Hearing Testimony of S.T.*

In his first claim, Monroe argues his Sixth Amendment right to confront witnesses against him was violated when the preliminary hearing testimony of S.T. was read at trial, in lieu of her testimony.  Monroe argues that S.T. was not "unavailable" because the prosecution failed to exercise due diligence in attempting to locate S.T.  (*See* Pet. at 6; *see also* Pet. Att. at 28-55.)  Respondent counters that the state exercised good faith in attempting to locate S.T. for trial and that the state court's denial of Monroe's Sixth Amendment claim was neither contrary to, nor an unreasonable application of, clearly established law.  (Answer at 7-10.)

### a.    Background and State Court Decision

Monroe raised this claim in the petition for review he filed in the California Supreme Court.  (Resp't Lodgment No. 19.)  That court denied the petition without comment or citation.  (*See* Resp't Lodgment No. 20.)   Accordingly, this Court must "look through" to the state appellate court's opinion as the basis for its analysis.  *Ylst*, 501 U.S. at 801-06.

The state appellate court determined that Monroe's Sixth Amendment rights were not violated because the prosecutor exercised due diligence in attempting to locate S.T.  Therefore, S.T. was "unavailable" and her preliminary hearing testimony could be read into the record at trial.  The court stated:

> Monroe asserts the court erred in declaring S.T. an unavailable witness and allowing her preliminary hearing testimony to be read to the jury, as the People did not make diligent efforts to secure her attendance at trial. This contention is unavailing.

/ / /

A. Background

Prior to jury selection in this matter, the prosecutor informed the court that it had made ongoing efforts to secure the attendance of L.Y. and S.T. with subpoenas, despite the fact trial had been continued on several occasions. The prosecutor told the court the People had successfully made contact with L.Y., but not with S.T. Based upon the People's inability to secure the attendance of S.T. at trial, the court held a hearing to determine whether the People had exercised due diligence in locating S.T. and whether it would be appropriate to declare her unavailable, thus allowing the People to read her preliminary hearing testimony to the jury. [Footnote 3. The court also held a hearing on the prosecution's due diligence in securing the attendance of L.Y. at trial. However, because L.Y. did appear and testify, we limit our discussion to the hearing on the prosecution's efforts to locate and secure the attendance of S.T.]

On July 19, 2005, the July 22 trial date was continued to September 13, 2005, at Monroe's request. On July 26 a subpoena was issued to an address in Northridge, California, which S.T. had given to police when she reported her rape. Debbie Lauerman, a paralegal at the San Diego County District Attorney's office, had maintained telephone contact with S.T. Each time there was an impending trial date, Lauerman called S.T.'s cell phone and left a voicemail message. On each occasion, S.T. returned Lauerman's calls.

On September 1, 2005, the trial was continued until December 1, again at Monroe's request. On September 10 a second subpoena was issued for the Northridge address. On September 19 the first subpoena was returned marked "return to sender." On that day, a new subpoena was prepared, without specifying an address, and an investigative service request (ISR) was prepared, including two possible San Diego addresses: S.T.'s mother's address in El Cajon and a prior address for S.T. in San Diego. Sometime in September Lauerman lost contact with S.T. Lauerman called S.T.'s cell phone number, but it was no longer in service.

The new subpoena and ISR were assigned to Maria Garcia, a process server. Garcia attempted to serve S.T. at both addresses, but she was not at either address.

On November 18, the trial was continued to December 15, 2005. On December 3, a fourth subpoena was issued, with another ISR. On December 14, Lauerman contacted S.T.'s victim's advocate, who was not of assistance. The next day, trial was continued until February 28, 2006, at Monroe's request. On December 20, 2005, another ISR was prepared, instructing Garcia to run a computer check for S.T.'s address. On February 8, 2006, Garcia ran a computer check on S.T. through multiple government and law enforcement sites, and discovered a possible address in Tustin, California. She forwarded the information to her supervisor, who later determined the address was not valid.

At around that time, San Diego Police Detective Joe Yamane came into contact with S.T., who gave him her new cell phone number. On February 17 the number was forwarded to Garcia.

On February 22, San Diego Police Detective John Zimmerman was assigned to locate S.T. Over a period of nine days, Detective Zimmerman ran S.T.'s information through every available database and came across addresses in San Diego, Long Beach, Tustin, Northridge, and El Cajon. None were valid. Officer Zimmerman went to S.T.'s mother's house in El Cajon. She confirmed

that S.T. was no longer in Tustin and confirmed her current phone number. S.T.'s mother stated that S.T. was living in Las Vegas, but she did not know where.

Detective Zimmerman called S.T.'s newest number and left messages for her. He also enlisted the help of L.Y., who also left messages for S.T. on her new number. Zimmerman ran the number through multiple databases and determined it was a valid number. He contacted local precincts and the vice squad to let them know he was looking for her. He posted an officer notification entry (ONS), which is a countrywide database informing officers that if they come into contact with S.T. they are to notify Detective Zimmerman. Detective Zimmerman continued to leave messages for S.T. and continued to run her rap sheet.

After hearing the above evidence and arguments of counsel, the court found the People had exercised sufficient diligence to secure S.T. as a witness. The court noted problems with witnesses often arise when there are multiple continuances because once a trial date is vacated, so is the subpoena directing attendance at the original trial date. The court also found the subpoenas went out in a timely fashion. The court rejected defense counsel's argument that the investigator should have gone to El Cajon Boulevard and "hit the streets," finding that notifying law enforcement agencies in the area to be on the lookout for S.T. was a more effective approach.

B. Applicable Legal Principles

The confrontation clauses of both the United States and California Constitutions guarantee criminal defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) However, this right is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) "An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. [Citations.] California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness." (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*).) It is the burden of the proponent of the evidence to prove unavailability and due diligence. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1296.)

We review de novo a court's finding of due diligence by the prosecution in its unsuccessful efforts to locate an absent witness to determine the validity of its subsequent declaration of unavailability warranting an exception to a defendant's constitutionally protected right of confrontation at trial. (*Cromer*, supra, 24 Cal.4th at p. 901.) "What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case. [Citation.] The term is incapable of a mechanical definition. It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character. [Citation.] The totality of efforts of the proponent to achieve presence of the witness must be considered by the court. Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation]." (*People v. Linder* (1971) 5 Cal.3d 342, 346-347.)

-9-

08cv1812

C. Analysis

The People acted with due diligence in attempting to secure S.T.'s presence at trial. At the time of the preliminary hearing, S .T. was cooperative and testified for the People. She remained cooperative until September 2005, when she stopped contacts with Lauerman. After she disappeared, the prosecution made diligent efforts to locate her, contacting family, enlisting the help of local police, and even having L.Y. assist them. The People's attempt to make her available for trial was hampered by several continuances, most at Monroe's request. This evidence demonstrates the prosecution undertook timely and serious efforts to locate S.T. and diligently pursued all pertinent information. (*See People v. Wilson* (2005) 36 Cal.4th 309, 342 [due diligence shown by investigator's two-day effort to locate a witness for retrial by visiting the witness's last known address, attempting to locate his known associates, and checking police, county, and state records using the witness's aliases]; *People v. Diaz* (2002) 95 Cal.App.4th 695, 706-707 [due diligence shown by investigator's speaking with a witness's mother and brother, going to schools the witness had attended, asking patrol officers to look for the witness, and checking hospital, arrest and Department of Motor Vehicles records].)

In asserting that the prosecution did not exercise due diligence, Monroe relies on *Cromer*, *supra*, 24 Cal.4th 889. *Cromer* is distinguishable. In *Cromer*, the prosecution was on notice of a witness's disappearance less than two weeks after the preliminary hearing and over two months before the original trial date. Although a subpoena was issued for the witness to attend trial, the prosecution made no effort to serve it on the witness. (*Id.* at p. 903.) The prosecution did not make any effort to serve a subsequently issued subpoena for the witness to appear on a rescheduled trial date. Even though the prosecution knew that the witness had disappeared from the neighborhood where she had lived months before the original trial date, it was not until shortly before the continued trial date that investigators made a few visits to her former residence. (*Ibid.*) Trial was continued again; it was not until after the case had been called for trial that the prosecution finally learned the witness was living with her mother in San Bernardino. (*Ibid.*) Despite the imminence of trial, the prosecution waited two full days to follow up on this information and obtain the relevant address. (*Id.* at pp. 903-904.) After jury selection had begun, an investigator went to the mother's residence, where he learned the mother would return the next day. Despite the fact the mother was the person most likely to know the witness's whereabouts, the investigator did not return to the residence and undertook no other efforts to contact the mother. (*Id.* at p. 904.) On the basis of this chronology, the court concluded that "serious efforts to locate [the witness] were unreasonably delayed, and investigation of promising information was unreasonably curtailed." (*Ibid.*)

Here, by contrast, as described in detail ante, the prosecution made adequate and diligent efforts to secure S.T.'s presence at trial.

(Resp't Lodgment No. 18 at 8-14.)

    b.   Analysis

The Sixth Amendment to the United States Constitution states: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. While certain types of hearsay may be admitted without the

benefit of confrontation, the Supreme Court held in *Crawford v. Washington*, 541 U.S. 36, 68 (2004) that the Sixth Amendment  places certain restrictions on the admission of testimonial hearsay evidence, stating "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  Although the *Crawford* court did not explicitly define what kind of evidence is "testimonial," testimony at a preliminary hearing is without question "testimonial" evidence.  *See id.* at 52.  Monroe does not argue that he was deprived an opportunity to cross-examine S.T. at the preliminary hearing.  Thus, this claim turns on whether the state court properly determined that S.T. was "unavailable."  *See id.* at 42.

Under clearly established Supreme Court law, "'a witness is not 'unavailable' for purposes of the . . .  exception to the confrontation requirement unless the prosecutorial authorities have made a good faith effort to obtain his presence at trial.'"  *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *Barber v. Page*, 390 U.S. 719, 724-25 (1969), overruled on other grounds by *Crawford*, 541 U.S. 68.  The *Roberts* Court defined "good faith effort" this way:

> The law does not require the doing of a futile act.  Thus if no possibility of procuring the  witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution.  But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.  "The lengths to which the prosecution must go to produce a witness . . . is  a question of reasonableness."  *California v. Green*, 399 U.S. at 189 n.22, 90 S.Ct. at 1951 (concurring opinion, citing *Barber v. Page*, supra).  The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.  As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.

*Roberts*, 448 U.S. at 74-75 (emphasis in original).

Here, the state court's conclusion that the state made good faith, diligent efforts to locate S.T. and produce her to testify at trial was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  Although much its analysis was based on state law, the appellate court articulated the correct federal standard.  Moreover, the same facts identified by the state court which showed due diligence on the part of the prosecutor showed good faith. Specifically, each time a trial date was set, the District Attorney's Office attempted to serve S.T. with a subpoena.  The first two subpoenas were sent in a timely fashion (after the trial date was

set, then postponed) to the Northridge address S.T. had provided to authorities.  (Resp't Lodgment No. 5, Rep.'s Tr., Vol. 1 at 78-79, 102-03; *see also*  Resp't Lodgment No. 2, Clerks's Tr., Vol. 2 at 276-78.)  And, for a period of time before the trial, Debbie Lauerman, a paralegal for the District Attorney's Office was in phone contact with S.T.  (Resp't Lodgment No. 5, Rep.'s Tr., Vol. 1 at 102-103.)

In mid-September, once Lauerman lost phone contact with S.T. and learned that S.T. had not received the subpoenas, immediate steps were taken to locate and serve S.T personally.  A third subpoena was prepared and given to a process server, Maria Garcia.  Attempts were made to serve S.T. at her mother's address in El Cajon and S.T.'s prior address in Southeast San Diego.  S.T. was not at either address.  (*Id.* at 119.)  Lauerman attempted to contact S.T. through her victim's advocate but was unsuccessful.  When the trial date was continued once again, a fifth subpoena was prepared.  Garcia ran S.T.'s information through multiple government and law enforcement sites but was unable to locate her.  (*Id.* at 121-23, 140.)

In the meantime, a detective had come into contact with S.T. and he passed her new cellular phone number on to Garcia.  (*Id.* at 94, 110.)  Both Laurerman and Detective Zimmerman attempted to call S.T. several times and left messages for her at that phone number but S.T. never returned their calls.  (*Id.* at 109, 112, 139.)  Zimmerman also searched numerous databases and enlisted the help of S.T.'s family and her acquaintance (and fellow victim) L.Y., in an unsuccessful attempt to persuade S.T. to come forward.  (*Id.* at 138-39.)  Officers went to S.T.'s mother's home and S.T.'s former home.  S.T.'s mother told officers she thought S.T. was in Las Vegas but that she did know where.  (*Id.* at 140-41.)  Zimmerman contacted local precincts and the vice department to let them know he was looking for S.T.  He also posted an "Officer Notification Entry," on a countrywide database by which Zimmerman informed law enforcement officers to notify him if they came into contact with  S.T.  (*Id.* at 143.)

The efforts of the District Attorney's Office and investigators in this case are similar to those which the Ninth Circuit has found sufficient to constitute good faith.  In *Dres v. Campoy*, 784 F.2d 996, 999 n. 2 (9th Cir. 1986), the Ninth Circuit upheld the district court's finding that the prosecutor made a good faith effort to procure a witness's testimony where the prosecution

attempted to locate the witness by: (i) calling numbers from which the witness had previously called her mother; (ii) contacting a local police department to determine the witness was not in custody and not living with her mother; (iii) visiting areas frequented by the witness and showing her picture; (iv) verifying the witness was not in a juvenile facility or hospital; (v) checking with the Department of Motor Vehicles for tickets issued to the witness; and (vi) visiting the witness's prior residences. *Dres v. Campoy*, 784 F.2d 996, 999 n.2 (9th Cir. 1986).

Here, likewise , investigators from the District Attorney's Office repeatedly called phone numbers believed to be those of S.T. *See id.* Furthermore, as in *Dres*, investigators contacted local precincts and vice departments and made them aware they were looking for S.T. Investigators visited both S.T.'s prior residence and her mother's residence, and efforts were made to contact S.T. through L.Y. and S.T.'s family.  Finally, as in *Dres*, the prosecution conducted a search of S.T.'s personal history and searched numerous databases. *See id.*  These efforts were no avail, but were reasonable under the circumstances and more than enough to constitute good faith.  *See Dres*, 784 F.2d at 999; *see also Roberts*, 448 U.S. at 74-75. Petitioner's claim that more could have been done does not negate the fact that the prosecution made a good faith effort to locate S.T., which is all the Confrontation Clause requires.  *See Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998); *Christian v. Rhodes*, 41 F.3d 461, 467 (9th Cir.1994) (stating that "while no court has articulated a standard for the diligence required of the prosecution . . . it is clear that herculean efforts are not constitutionally required").

Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.  *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254. The Court therefore recommends this claim be **DENIED**.

### 2.     *Transcript of S.T.'s 911 Call*

In his second claim, Monroe argues that the transcript of S.T.'s 911 call should not have been entered into evidence because it was testimonial and Monroe did not have an opportunity to cross-examine S.T. at trial.  Monroe raised this claim in a petition for review to the California Supreme Court and it was denied without comment or citation.  Accordingly, the Court looks to the California Court of Appeal's opinion.  In denying the claim, the state court cited to the

Supreme Court's decision in *Davis v. Washington*, 547 U.S. 813 (2006) and concluded that S.T.'s 911 call was not "testimonial" because it was made while seeking assistance for an ongoing emergency.   Specifically, the court stated:

> S.T.'s 911 call was not testimonial under *Crawford* and *Davis*.  Her primary purpose in making the call was to secure police assistance to meet an ongoing emergency and get medical attention following her rape.  As in *Davis*, the questions by the 911 dispatcher demonstrated that the operator's primary purpose was to obtain crucial information necessary to aid the police in meeting the emergency and not to establish or prove some past fact.  The dispatcher's questions were directed towards determining S.T.'s location and type of help she needed.  S.T. gave a description of Monroe, his vehicle and the direction he went; told the operator he had a handgun and described the nature of her injuries and her location.  That information was necessary to provide the operator with information necessary to locate her, provide her with medical assistance, locate Monroe and inform officers of the threat he posed.

(Resp't Lodgment No. 18 at 19.)

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established law.  As discussed above, the second prong of the Sixth Amendment analysis under *Crawford* requires the Court to examine whether the defendant was provided a prior opportunity to cross-examine the witness.  *Crawford*, 541 U.S. at 68.  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  The Supreme Court has held, however, that a face-to-face encounter is not required in every instance.  Rather, ". . .the Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial."  *Id.* at 847-48.

The Supreme Court considered a similar issue in *Davis v. Washington*, 547 U.S. 813 (2006).  In determining whether a statement, such as a 911 call, is "testimonial" the Supreme Court held:

/ / /

/ / /

08cv1812

Statements are nontestimonial when made in the course of police interrogation under the circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 547 U.S. at 827.

Barber, the witness, placed the initial call to 911 and reported that an attempted rape had occurred.  Barber then gave the phone to S.T.  The following exchange took place:

911:   Okay, when did this happen?

S.T.:  This just happened like less then 5 minutes ago.

911:   How did he try to hurt you?

S.T.:  He, umm, he was like, I was on El Cajon Boulevard.  He was like following me and he got out the car.   So, I just kinda like u-turned like down like a back street and he got out the car and he like pointed a gun to my back and told me to get into his vehicle. So, I got into his car 'cause he said he was going to shoot me.  And then he bring me to this parking lot and he.

911:   Did you see a gun?

S.T.:  Yes, he pulled it out on me.

911:   Okay.

S.T.:  He put it to my head.

911:   Okay, just a moment, I'm going to put a supervisor on the phone okay?

S.T.:  Yes.

911:   You, you don't this [sic] guy, right.

S.T.:  No, I don't know this guy.

911:   Okay, stay on the phone.

SUP:  Go ahead.

911:   Okay, there [sic] saying it's a 261 attempt.  She was threatened with a gun and she's now with a cabbie, who heard her screaming and the, uh suspect just left.

SUP:  The suspect left on foot or in a car?

ST:   He left in a car.

-15-

08cv1812

1    SUP:   What type of car?

2    ST:    Ford Explorer.

3    SUP:   Right, Ford Explorer, it's listed at 1108.

4    S.T.:   Expedition, an Expedition, a 4-door.

5    SUP:   What color?

6    S.T.:   Burgundy or maroon.

7    SUP:   Which way did he go?

8    911:   Umm, he proceeded to the left.

9    911:   Towards Texas or?

10   ST:    Yeah, towards Texas.

11   911:   Okay. And he had a gun, a hand gun?

12   ST:    Yes.

13   (Resp't Lodgment No. 1, Clerk's Tr. Vol. 1 at 86-88.)

14           The call continued and the emergency operators asked S.T. if she required medical

15   attention.  S.T. replied that she was not physically hurt.  The operators then asked S.T. for a

16   description of her assailant.  She described him as black, between the ages of 25 and 30, wearing

17   blue shorts and blue t-shirt, shaved head, 6' 2 " tall and weighing between 180 and 200 pounds.

18   (*Id.* at 88-90.)  The operator also asked for additional details about the car the suspect was

19   driving. S.T. reported that the SUV was an older model, possibly 1998 to 2000 and did not have

20   special tire rims.  (*Id.* at 90.)

21           In sum, S.T.'s statements to the emergency dispatchers were for the purpose of helping

22   emergency responders to locate S.T. and assist her as well as finding the suspect who was

23   reportedly still armed with a handgun. The emergency call was made immediately after S.T. was

24   assaulted.  She described her attacker and his vehicle, and provided the direction of his escape

25   while emergency responders were sent to her location to assist her and search for her assailant.

26   The primary purpose of the call was to get law enforcement's assistance with an ongoing

27   emergency.  *Davis*, 547 U.S. at 827.  Thus, as the state court found, the statements were not

28   testimonial.  *See id.* (finding that the "statements were necessary to be able to resolve the present

1  emergency . . . [t]hat is true even of the operator's effort to establish the identity of the assailant,

2  so that the dispatched officers might know whether they would be encountering a violent felon").

3        The state court denial of this claim was neither contrary to, nor an unreasonable

4  application of, clearly established Supreme Court law.  *See Williams*, 529 U.S. at 412-13; 28

5  U.S.C. § 2254.  This Court recommends the claim be **DENIED**.

6        **3.**      ***CALJIC Numbers 220 & 222***

7        It his third claim, Monro argues his right to due process was violated when the trial court

8  instructed the jury in accordance with California Jury Instructions – Criminal ("CALJIC")

9  Numbers 220 and 222. Monroe claims that the instructions precluded the jury from finding

10 reasonable doubt based on *lack* of evidence.   Respondent counters that the state court's denial

11 of the claim was reasonable.  (*See* Answer at 15-16.)  The California Supreme Court denied the

12 claim without comment or citation. Accordingly, this Court must look to the state appellate

13 court's decision.  *See Ylst*, 501 U.S. at 801-06.  In denying this claim, the court of appeal stated:

14       Monroe asserts that the court erred in instructing the jury under CALCRIM
         Nos. 220 and 222, as they precluded the jury from considering his defense that the
15       absence of scientific evidence raised a reasonable doubt as to his guilt.

16       . . .

17       Two recent appellate decisions, including one by this court, have rejected
         the exact contention put forward by Monroe: That the. . . language in CALCRIM
18       Nos. 220 and 222 prevented him from arguing that the lack of evidence raised a
         triable issue of fact as to his guilt.  (*People v. Westbrooks* (2007) 151 Cal.App.4th
19       1500 (*Westbrooks*); *People v. Flores* (2007) 153 Cal.App.4th 1088 (*Flores*).)

20 (Resp't Lodgment No. 18 at 20-21.)

21       It is clearly established that due process requires "proof beyond a reasonable doubt of

22 every fact necessary to constitute the crime with which [the defendant] is charged.  *In re*

23 *Winship*, 397 U.S. 358 (1970).  The instructions, taken as a whole, "must correctly convey the

24 concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Lisenbee v.*

25 *Henry*, 166 F.3d 997, 999 (9th Cir. 1999).  In reviewing instructions regarding the burden of

26 proof, a court must "determine whether there was a reasonable likelihood that the jury

27 understood the instruction to allow a conviction predicated on proof that was insufficient to meet

28 the requirements of due process."  *Lisenbee*, 166 F.3d at 999.

First, the Court of Appeal's denial of the claim was not contrary to clearly established federal law.  The two cases cited by the appellate court – *Flores* and *Westbrooks* – analyze CALJIC Numbers 220 and 222 under the appropriate federal standard, discussed above.  *See Flores*, 153 Cal.App.4th at 1092-93 (citing *Winship*, 397 U.S. at 631-32 and *Victor*, 511 U.S. at 5); *Westbrooks* 151 Cal.App.4th 1508 (same).

Second, the state court decision reasonably applied federal law in denying the claim.  The jury was instructed pursuant to CALJIC Number 220, which states, in part: "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  (Resp't Lodgment No. 2, Clerk's Tr. Vol. 1 at 127.)  Under CALJIC Number 222, the jury was instructed regarding "evidence," specifically: "You must decide what the facts are in this case.  You must use only the evidence that was presented in this courtroom.  "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence and anything else I told you to consider as evidence."  (*Id.* at 128.)  Monroe argues that these two instructions precluded the jury from considering whether reasonable doubt existed based on the *lack* of any evidence.  His argument is without merit.

The jury instructions Monroe challenges, when considered in context of the trial and the instructions as a whole, did not render his trial fundamentally unfair.  The jury was properly instructed as to the burden of proof.  The trial court instructed the jurors that every element of the offenses must be proved beyond a reasonable doubt.  Indeed, CALJIC Number 220 specifically states that a defendant is entitled to acquittal "unless the evidence proves the defendant guilty beyond a reasonable doubt."  CALJIC Number 220.  The instruction merely informs the jury that the state cannot satisfy its burden of proof based on evidence other than that offered at trial.  The instruction does not tell the jury that it may not consider any perceived lack of evidence in determining whether there is a reasonable doubt as to a defendant's guilt.  If there was a "lack" of evidence to support any element of an offense, as Monroe suggests, then the juror would not have the necessary evidence to find guilt beyond a reasonable doubt.  Further,

the remainder of the instructions clearly conveyed to the jury the notion that the People had the burden of proving Monroe's guilt beyond a reasonable doubt.  The jury was meticulously instructed as to the elements of each charged offense and specifically, that the "People must prove" each one beyond a reasonable doubt.  (*See* Lodgment No. 1, Clerk's Tr., vol. 1 at 149-161; CALJIC Nos. 890, 2511, 1203, 1000, 1015, 2511, 3146, 3175, 3179 and 3181.)  When considering all of the instructions as a whole, there was no "reasonable likelihood that the jury understood the instruction to allow a conviction predicated on proof that was insufficient to meet the requirements of due process." *Lisenbee*, 166 F.3d at 999.

Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. § 2254. Therefore, the Court recommends the claim be **DENIED**.

### 4.    *Request for Evidentiary Hearing*

Finally, Monroe makes a general request for an evidentiary hearing. (*See* Traverse at 11.) Evidentiary hearings in 28 U.S.C. § 2254 cases are governed by the AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999).  The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> > (A) the claim relies on –
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The Ninth Circuit has outlined the procedure for district courts to follow in determining whether to grant a request for an evidentiary hearing.  First, the Court must "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (citing *Baj*a, 187 F.3d at 1078).  If not, the Court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'"  *Id.*  A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *See Williams*, 529 U.S. at 432.  The Supreme Court has said that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law."  *Id*. at 437.  If the petitioner has failed to develop the factual basis for his claim in state court, "the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B)."  *Insyxiengmay*, 403 F.3d at 669-70.

Moreover, "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts."  *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005 (citing *Lockyer*, 538 U.S. at 71.)

The Court concludes that Monroe is not entitled to an evidentiary hearing on any of his claims.  First, there is a sufficient factual basis for Monroe's claims in the record.  As to the claim regarding S.T.'s unavailability, the state trial judge held a hearing during which evidence was presented regarding the attempts made to locate S.T.  The evidence presented at the hearing by Monroe's counsel and the District Attorney provide a sufficient factual basis for the Court to resolve Monroe's claim regarding S.T.'s availability.  *See Insyxiengmay*, 403 F.3d at 669-70. Similarly, the transcript of S.T.'s 911, in conjunction with Barber's testimony, is sufficient for this Court to resolve Monroe's Confrontation Clause claim pertaining to S.T.'s statements made to the 911 operator.  No additional evidence is necessary to resolve Monroe's jury instruction claim.

In addition, Monroe did not request an evidentiary hearing in state court.  (*See* Resp't Lodgement Nos. 15, 19.)  Thus, to the extent he now seeks to introduce new evidence, he has "failed to develop" those facts in state court.  *Williams*, 529 U.S. at 437.  Because neither of the two exceptions outlined in 28 U.S.C. § 2254(e)(2) applies, Monroe is not entitled to an evidentiary hearing.  *Insyxiengmay*, 403 F.3d at 669-70.  The Court therefore recommends the request be **DENIED.**

## V.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to the United States District Judge M. James Lorenz, under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. For the reasons outlined above, **IT HEREBY RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition with prejudice.

**IT IS ORDERED** that no later than **July 30, 2009,** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 20, 2009**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  June 26, 2009

Jan M. Adler
U.S. Magistrate Judge