1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10

11   JAMES MONROE,                    )   Civil No. 08cv1812 L(JMA)
                                      )
12                  Petitioner,       )   **ORDER OVERRULING OBJECTIONS;**
                                      )   **ADOPTING REPORT AND**
13   v.                               )   **RECOMMENDATION; DENYING**
                                      )   **PETITION FOR WRIT OF HABEAS**
14   A. HEDGPEHT,                     )   **CORPUS; DENYING CERTIFICATE**
                                      )   **OF APPEALABILITY and DIRECTING**
15                  Respondent.       )   **ENTRY OF JUDGMENT**
                                      )
16   _____ )

17          Petitioner James Monroe filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §

18   2254 that has been fully briefed. The matter was referred to United States Magistrate Judge Jan

19   M. Adler for a Report and Recommendation ("Report") under 28 U.S.C. § 636(b)(1)(B) and

20   Civil Local Rule 72.3.  The magistrate judge issued a Report recommending the petition be

21   denied in its entirety. Petitioner timely filed objections. Respondent did not file an objection or a

22   response to petitioner's objections.

23   **A.     Standard of Review**

24          A federal court may not grant an application for writ of habeas corpus on behalf of a

25   person in state custody with respect to any claim that was adjudicated on the merits in state court

26   proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to,

27   or involved an unreasonable application of, clearly established Federal law, as determined by the

28

Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). But the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

> Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the [State's action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.

*Cupp v. Naughten*, 414 U.S. 141, 146 (1973)

Under 28 U.S.C. § 636(b)(1), in reviewing a magistrate judge's report and recommendation, the district court "shall make a *de novo* determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Under this statute, "the district judge must review the magistrate judge's findings and recommendations *de novo if objection is made, but not otherwise*." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir.) (*en banc*) (emphasis in original); *see Schmidt v. Johnstone*, 263 F. Supp. 2d 1219, 1225-26 & n.5 (D. Ariz. 2003) (applying *Reyna-Tapia* to habeas review). As previously noted, petitioner filed objections ("Obj.") to the Report.

**B.    Background**

**1.    Factual Background**

Petitioner does not object to the factual background contained within the California Court of Appeals decision but objects to the legal consequences of those facts. The facts as found by the state appellate court are as follows:

A.    People's Case

1. L.Y.

In January 2005 L.Y. was working as a prostitute on El Cajon Boulevard in San Diego. L.Y. saw Monroe drive by her a couple of times in a burgundy Ford Expedition. He stopped his car in the middle lane and asked L.Y. if she wanted a ride. He said no one

08cv1812

would see her if she hurried and got into the car. After Monroe denied being a cop, she got into his car. L.Y. told him her name was Sarah, and he told her his name was Yohan. L.Y. agreed to orally copulate and have sex with Monroe for $100.

Monroe drove to a residential area about 10 blocks away and parked his car on the street. L.Y. turned to her right to see if her passenger door was locked and felt something poking her in the side. Monroe had a gun pointed at her left rib cage and his penis was pulled out of his pants. Monroe told her, "Give me some head."

L.Y. screamed and asked Monroe, "[W]hat are you doing?" Monroe kept jabbing her with the gun and demanding that she "give [him] some head." L.Y. decided to cooperate with Monroe so he would not shoot her. She reached for a condom and Monroe told her not to use one because he did not like condoms. L.Y. performed oral sex on Monroe while he pointed the gun at her back, pushing down on her head with his other hand.

While L.Y. was orally copulating Monroe, he demanded that she "[g]ive [him] some pussy." L.Y. lied and told him she could not have sex because she had recently had an abortion. Once they were finished, Monroe put the gun in the pocket of the driver's side door. L.Y. began crying. Monroe apologized and dropped her off in the same vicinity where he had picked her up. As Monroe was dropping her off, he moved the gun to the back seat of his car. He also told L.Y. that next time he would give her money.

L.Y., who was hysterical at this point, looked for a police officer, and then called her boyfriend on a pay phone and asked him to pick her up. Meanwhile, a man saw L.Y. and asked her if she wanted to call the police. She told him "no" because she had a warrant out for her arrest. L.Y. asked, and the man gave her a ride home.

The next day, L.Y. called S.T. and some other prostitutes to warn them not to get into Monroe's car. A few weeks later, when she was working as a prostitute, she saw Monroe's car. A few weeks after that, she heard that Monroe had raped S.T. Thereafter, L.Y. contacted the police and told them what happened to her.

L.Y. admitted she had prior misdemeanor convictions for prostitution and loitering for prostitution. She also believed there was a warrant out for her arrest because she failed to obtain a court-ordered AIDS test.

2. S.T. [Footnote 2]

[Footnote 2: S.T. was not present at trial and her preliminary hearing testimony was read to the jury. The propriety of the court declaring her an unavailable witness to allow that testimony to be read to the jury is discussed in more detail post.]

08cv1812

On February 14, 2005, S.T. parked her car on Ohio Street and walked to El Cajon Boulevard to engage in prostitution. Monroe pulled up next to her in a burgundy Ford Expedition and told her to get in. S.T. ignored Monroe and kept walking down El Cajon Boulevard. Monroe pulled up next to her again, got out of the car and said, "My money's not good enough?" S.T. replied, "No. Leave me alone." S.T., who is also Black, explained that, for a variety of reasons, most prostitutes "don't date Black guys."

S.T. turned around and began walking back to her car. As she was walking down Ohio Street, she saw Monroe walking towards her, near where she had parked her car. S.T. turned around again and began walking back to El Cajon Boulevard. Monroe approached her from behind, pointed a gun in her back and said, "Don't move. Don't make any sounds or I'll shoot you." Monroe forced S.T. into the back seat of his car and drove to the parking lot of an office building on Camino Del Rio South. All the while, Monroe pointed his gun at her.

Monroe told S.T. to pull down her pants. She started to pull them down but Monroe became impatient and yanked them down. Monroe climbed into the back seat with her, removed his shirt, and told her to orally copulate him.

S.T. told Monroe that she needed to use the bathroom. However, he would not let her out of the car, so she urinated a little on the back seat. Monroe then let S.T. out of the car to urinate, while holding the hood of her jacket and pointing the gun at her. She then got back in the car, leaving the passenger door unlocked.

Monroe forced her to perform oral sex on him without a condom until he became erect. Monroe then climbed on top of her and told her, "I want some pussy." He then had intercourse with S.T. without a condom.

Monroe was interrupted when he saw Jeffrey Barber leave the office building and walk to his car. S.T. took the opportunity to flee from Monroe's car through the unlocked passenger door. Monroe grabbed her jacket, ripping it, and S.T. began to scream. She was able to break loose and ran towards Barber. She climbed over and then fell down a four-foot wall separating the level of the parking lot where Monroe was parked and the lower level where Barber was parked. She then ran to Barber's car.

When Barber reached his car, he heard someone screaming, "Help me, please. Don't leave. Stop. He's raping me. Gun. Help, help, help, help. Stop. Help." Barber looked to the right and saw S.T. fall to the asphalt from the wall. S.T. ran to Barber's car and got in the front passenger side. S.T. was completely nude except for a white puffy jacket. S.T. was hysterical. Barber got out of his car and saw a man next to a sports utility vehicle (SUV), with its driver's side front and rear doors open, reaching into the back seat. Barber grabbed S.T. by the jacket and they jumped over a retaining wall and ran west. Barber then saw the man with the SUV start his car and drive away. Barber and S.T. returned to Barber's car and he called 911.

4

08cv1812

1
2
3
4

San Diego Police Officer David Spitzer responded to the scene. S .T. told him that she was working as a prostitute when Monroe forced her into his car at gunpoint, forced her to orally copulate him, and then raped her for about five minutes until she escaped. Officer Spitzer took S.T. to the hospital for a sexual assault examination. Officer Gary Hill located what appeared to be a puddle of urine in the parking lot.

5
6
7

S.T. told police that she had made two "house calls" earlier that day. She also remembered L.Y. telling her to stay away from a man named Yohan who was possibly in the military and drove a Ford Expedition. She also admitted she was on probation for prostitution.

8
9

Both L.Y. and S.T. identified Monroe in photo lineups. Monroe's house was searched and it was determined he owned a burgundy 2000 Ford Expedition. He was arrested shortly thereafter.

10

B.     Defense Case

11
12

Detective Thomas Joy described an incident on January 1, 2005, when he was working undercover to catch prostitutes. That evening, S.T. solicited sex to Detective Joy and was arrested.

13
14

Criminalist Sean Soriano examined the back seat of Monroe's car and found semen. Soriano did not test the back seat to determine if it was urine there.

15
16
17
18

Skin scrapings underneath S.T.'s fingernails were checked for a DNA analysis because S.T. had reported, "I had my nails in his back when he was on top of me." In the scrapings, criminalist Ian Fitch found semen cells as well as skin cells belonging to S.T. and another woman. There were not enough sperm cells to run a DNA analysis and identify the donor.

(Resp't Lodgment No. 18 at 3-8.)

19
20

**2.     Procedural Background**

The procedural background set forth below is found in the Magistrate Judge's Report.

21
22
23
24
25
26

On March 2, 2006, the District Attorney for the County of San Diego filed an Amended Information charging James Monroe with eight counts related to the sexual assaults of two victims. The information alleged two counts of forcible oral copulation (Cal. Penal Code § 288a(c)(2)); one count of assault with intent to commit oral copulation (Cal. Penal Code § 220(a)); two counts of possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)); one count of kidnaping for rape (Cal. Penal Code § 209(b)(1)); one count of forcible rape (Cal. Penal Code § 261(a)(2)); and one count of assault with intent to commit rape. (Cal. Penal Code § 220(a)). (*See* Resp't Lodgment No. 1, Vol. 1 at 76-82.)

27
28

On March 10, 2006, after a jury trial, Monroe was convicted of all eight counts. The jury also found that Monroe had personally used a firearm as to four of the counts (Cal. Penal Code § 12022.3(a)); committed an offense against more

5

08cv1812

than one victim (Cal. Penal Code § 667.61 (a), (c), (e)); and kidnaped a victim for the purpose of committing a sexual offense (Cal. Penal Code § 667.8(a); 667.61 (a), (c), (d)). (*See* Resp't Lodgment No. 1, Clerk's Tr., Vol. 2 at 177-86.) Monroe also admitted having five prior convictions, including a prison prior, a serous felony prior and one strike prior under California's Three Strikes law (Cal. Penal Code §§ 667.5(a)(1), (b)-(i); 668; 1170.12; and 1192.7). On May, 31 2007, the court sentenced Monroe to 109 years to life in prison. (Resp't Lodgment No. 2, Clerk's Tr., Vol. 2 at 0265-67.)

Monroe appealed to the California Court of Appeal, Fourth Appellate District, Division One. (*See* Resp't Lodgment No. 15.) On February 29, 2008, the appellate court affirmed Monroe's conviction in an unpublished decision. (Resp't Lodgment No. 18.) Monroe filed a petition for review in the California Supreme Court. (Resp't Lodgment No. 19.) The court denied the petition without comment on May 14, 2008. (Resp't Lodgment No. 20.)

On October 3, 2008, Monroe filed the instant Petition in this Court. [Doc. No. 1]. Respondent filed an Answer on January 12, 2009 [Doc. No. 7], and Petitioner filed his Traverse on January 26, 2009 [Doc. No. 9].

## C.   Objections

Petitioner raised three grounds in his habeas petition: (1) his Sixth Amendment rights were violated when the trial court permitted the preliminary hearing testimony of one of the victims, who did not testify at trial, to be admitted as evidence; (2) his Sixth Amendment rights were violated when the trial court permitted the transcript of the non-testifying victim's 911 emergency call to be admitted as evidence; and (3) his Due Process rights were violated when the jury was instructed, pursuant to California Jury Instructions - Criminal ("CALJIC") Nos. 220 and 222. Monroe also requested an evidentiary hearing. (*See* Traverse at 11.) The magistrate judge recommended the petition be denied as to all three grounds because the state court's rulings were not constitutionally deficient and there was no basis for an evidentiary hearing. Petitioner objects to the Report: "Petitioner rebuts the presumption of correctness in this court reasoning that the prior court rulings of this matter are correct." (Obj. at 1.) Because it appears that petitioner objects to the Report in its entirety, the Court reviews the habeas petition *de novo*.

### 1.   Preliminary Hearing Testimony

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford v. Washington*, the Court held that "[w]here testimonial evidence is at issue,

1  ... the Sixth Amendment demands what the common law required: unavailability and a prior

2  opportunity for cross-examination." 541 U.S. 36, 68 (2004). This rule applies to testimony given

3  at preliminary hearings. *Id.* The United States Supreme Court has held that "a witness is not

4  'unavailable' for purposes of the ... exception to the confrontation requirement unless the

5  prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v.*

6  *Page*, 390 U.S. 719, 724-25 (1968).  The prosecution must exercise reasonable diligence to

7  secure the witness's presence at trial. But it need not take every conceivable measure to secure a

8  witness appearance. *Windham v. Merkle,* 163 F.3d 1092, 1102 (9th Cir. 1998)(citing *Barber*, 390

9  U.S. at 724-25). It is the prosecution's burden to demonstrate that it took reasonable steps to do

10  so. *Roberts*, 448 U.S. at 74.

11       Here, petitioner contends that the reading of the preliminary hearing testimony of witness,

12  S.T., was improperly admitted at trial because S.T. was not unavailable and the prosecution

13  failed to meet its burden of locating S.T. for trial.

14       The state court  applied the correct federal standard in finding that the prosecution had

15  made sufficient and reasonable efforts to procure S.T.'s testimony noting that the District

16  Attorney's Office remained in telephonic contact with S.T. each time a trial date was set until

17  she ceased to cooperate, attempted to serve subpoenas on S.T. at her prior address and her

18  mother's address, and had a process server do multiple government and law enforcement site

19  searches. A detective came into contact with S.T. and obtained her new phone number but she

20  failed to return messages that both Detective Zimmerman and the paralegal for the District

21  Attorney's Office had left for her. Officers went to S.T.'s mother's home for assistance in

22  locating her. The other victim in the case, L.Y., attempted to obtain S.T. cooperation. Detective

23  Zimmerman also posted an "Officer Notification Entry" on a countrywide database about

24  notifying him if S.T. was located.

25       Petitioner contends, however, that the District Attorney's Office had other possible

26  addresses for S.T. and could have made other efforts to locate her. But as noted above, the

27  prosecution does not have to take every conceivable measure to secure a witness. The record

28  amply establishes the prosecutor took numerous measures to locate S.T. These attempts

7

1  demonstrate that the prosecutor exercised due diligence and the admission of S.T.'s testimony at

2  the preliminary hearing did not deprive petitioner of his right to confrontation. Accordingly, the

3  California Court of Appeal's decision rejecting petitioner's claim was not contrary to or an

4  unreasonable application of clearly established federal law.

5         **2.**      **911 Emergency Call**

6        Petitioner contends that the transcript of S.T.'s 911 call at the time of the incident violated

7  his Sixth Amendment right to confrontation under *Crawford.*  As discussed above, *Crawford*

8  held that the testimonial statements of a witness absent from trial are admissible only where the

9  witness is unavailable and the defendant had a prior opportunity to cross-examine him. *Id.* at 68.

10  The *Crawford* court did not define the term "testimonial," but gave examples including grand

11  jury testimony, prior trial testimony, preliminary hearing testimony, and statements taken by

12  officers in the course of interrogation. *Id.*

13        Two years after *Crawford*, the Supreme Court in *Davis v. Washington*, 547 U.S.

14  813(2006), held a statement is non-testimonial when made "under circumstances objectively

15  indicating that the primary purpose of the interrogation is to enable police ... to meet an ongoing

16  emergency." Id. at 822.

17        The Ninth Circuit Court of Appeals recently addressed this specific issue in *Gragg v.*

18  *Prosper,* 2011 WL 52483 (9th Cir. 2011). The *Gragg* Court held that the state court's

19  characterization of the 911 calls as non-testimonial under *Davis v. Washington*, 547 U.S. 813

20  (2006), and thus not subject to the Confrontation Clause, was not an unreasonable application of

21  clearly established Federal law nor an unreasonable determination of the facts presented.

22        Here, the state court concluded that S.T.'s 911 call was not testimonial because it sought

23  assistance for an ongoing emergency, and therefore, was not subject to a *Crawford* analysis. The

24  record relied on by the state court of appeals shows that a cab driver witness, Barber, placed the

25  911 call and reported an attempted rape. Once given the phone, S.T. told the 911 operator that

26  the incident happened "like less than 5 minutes ago." S.T. continued by telling the 911 operator

27  that the man pulled a gun on her and eventually left the scene in a Ford Explorer. The 911

28  operator asked for a description of the assailant, and details about the car. (Resp. Lodgment No.

08cv1812

1, Clerk's Tr. Vol. 1 at 86-90.)

The state court's determination that S.T.'s 911 call statements were nontestimonial because they were made in an effort to assist officers in finding the perpetrator, who was reportedly armed, and to provide help to the victim of the crime and were therefore properly admitted as evidence without violation of defendant's right to confrontation was not an unreasonable application of clearly established Federal law nor an unreasonable determination of the facts presented.

### 3.    Jury Instructions

Habeas relief based on an erroneous instruction is available when 'the ailing instruction by itself so infect[s] the entire trial that the resulting conviction violates due process," *Cupp*, 414 U.S at 147, not merely when "the instruction is undesirable, erroneous, or even 'universally condemned." *Id.*, at 146. Further, the lack of or an incomplete instruction is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

Petitioner contends that by instructing the jury with California Jury Instructions – Criminal ("CALCIJ") Nos. 220 and 222, the jury was precluded from considering his defense that the lack of physical evidence raised doubt as to whether he committed the crimes.

CALCIJ No. 220 states:

> In deciding whether the People have provided their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughtout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty.

CALCIJ No. 222 provides:

> You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom. "Evidence" is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence.

The State Court of Appeals denied petitioner's argument noting that two other appellate decision rejected petitioner's contention – *People v Westbrook*, 151 Cal. App. 4th 1500 (2007) and *People v. Flores*, 153 Cal. App.4th 1088 (2007) – based on applicable federal law. The Supreme Court has held that the due process clause requires the government must prove beyond

08cv1812

a reasonable doubt every element of a charged offense and trial courts must avoid defining

reasonable doubt so as to lead jury to convict on lesser showing than due process requires. *In re*

*Winship*, 397 U.S. 358 (1970); *Victor v Nebraska*, 511 U.S. 1, 23 (1994). Further, the jury may

consider only the evidence presented at trial as opposed to evidence that exists but is not

presented at trial, in assessing whether the charge has been proved beyond a reasonable doubt.

*Victor*, 511 U.S. at 15-16;

Here, the jury could not have understood that consideration of a lack of evidence was

precluded by the instructions given. The only reasonable interpretation of these instructions is

that if the evidence presented to the jury was insufficient to prove each element of the offense

beyond a reasonable doubt, such lack of evidence would have been required an acquittal.

Accordingly, there is no reasonable likelihood that the jurors who determined petitioner's guilt

applied the instructions in a way that violated the Constitution and the state courts' denial of

petitioner's instructional error claim was neither contrary to, nor an unreasonable application of,

clearly established federal law. *See* 28 U.S.C. § 2254(d).

### 4.   Request for Evidentiary Hearing

In his objection to the recommendation that petitioner's request for an evidentiary hearing

be denied, he acknowledges that he made a general request for such a hearing. Petitioner has not,

however, offered any factual basis for finding an evidentiary hearing necessary.

To obtain an evidentiary hearing, a petitioner is "required to allege specific facts which, if

true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir.1998) (internal

quotation marks and citation omitted). The district court will not hold an evidentiary hearing

unless (1) the petitioner's claim relies on a new rule of constitutional law or "factual predicate

that could not have been discovered though the exercise of due diligence" and (2) the petitioner

can show that "the facts underlying the claim would be sufficient to establish by clear and

convincing evidence that, but for constitutional error, no reasonable fact-finder would have

found the appellate guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

As a threshold matter, petitioner has not alleged a valid reason why he is entitled to an

evidentiary hearing under § 2254(e) (2). He does not assert that his claims rely on a new rule of

08cv1812

constitutional law that the Supreme Court has made retroactive to cases on collateral review, nor does he allege that the factual predicate of his claim could not have been previously discovered through the exercise of due diligence. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also Gandarela v. Johnson*, 286 F.3d 1080, 1087 (9th Cir. 2002) (evidentiary hearing properly denied where the petitioner "failed to show what more an evidentiary hearing might reveal of material import"), cert. denied, 537 U.S. 1117 (2003).

Accordingly, petitioner's objection will be overruled and his request for an evidentiary hearing denied.

### 5.    Certificate of Appealability

Under 28 U.S.C. § 2253(c), petitioner must obtain a certificate of appealability to file an appeal of the final order in a federal habeas proceeding. A certificate of appealability may issue only if Petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is met "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because petitioner has not made a substantial showing of the denial of a constitutional right, certificate of appealability is **DENIED** in all respects.

### D.    Conclusion

Based on the foregoing, **IT IS ORDERED:**

1.    Petitioner's objections are **OVERRULED** and his request for an evidentiary hearing is **DENIED**;

2.    The Report and Recommendation is **ADOPTED** in its entirety;

3.    Petitioner's petition for writ of habeas corpus is **DENIED**;

/ / /

/ / /

/ / /

/ / /

08cv1812

4.      A Certificate of Appealability is **DENIED**; and

5.      The Clerk of the Court is directed to enter judgment in accordance with this Order.

**IT IS SO ORDERED.**

DATED:  February 22, 2011

_____
M. James Lorenz
United States District Court Judge

COPY TO:

HON. JAN M. ADLER
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

12

08cv1812